# UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

AUDREY SHORT individually and FAYE,      :
SHORT, individually and as Trustee for the   :
Faye S. Albert Retirement Plan,               :
     Plaintiffs,                              :          **Case No. 3:09-cv-1955 (VLB)**
                                  :
         **v.**                                     :
                                  :
CONNECTICUT COMMUNITY BANK, N.A.       :          **March 28, 2012**
    Defendant.                            :

## MEMORANDUM OF DECISION DENYING PLAINTIFF'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. # 67] AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [DKT. # 69]

This action arises out of the Ponzi scheme perpetrated by Bernard L. Madoff. The two individual Plaintiffs maintained custodial accounts with Westport National Bank ("WNB"), a division of the Defendant Connecticut Community Bank, N.A. ("CCB"),[1] for their investments with Bernard L. Madoff Investment Securities, LLC ("BLMIS"). After Madoff admitted his fraud, the Plaintiffs commenced this action raising claims of: (1) breach of contract, (2) breach of fiduciary duty, (3) professional negligence, and (4) aiding and abetting breach of fiduciary duty and fraud. As damages, the Plaintiffs seek to recover lost investment income and fees paid to WNB.

The Plaintiffs have moved, pursuant to Federal Rule of Civil Procedure 56,

---

[1] Although CCB is the only named Defendant, this action only concerns the Plaintiffs' relationship with WNB. Accordingly, this ruling will refer to the named Defendant as WNB.

for partial summary judgment on their breach of contract claim [Dkt. # 67].  WNB

has similarly moved for summary judgment on all the Plaintiffs' claims [Dkt. # 69].

Because this Court concludes that triable issues exist with respect to all but one

of the Plaintiffs' claims, the Plaintiffs' motion [Dkt. # 67] is DENIED and WNB's

motion [Dkt. # 69] is GRANTED IN PART and DENIED IN PART.

I.      <u>Background</u>[2]

       In December 2008, when Madoff admitted his Ponzi scheme and BLMIS

collapsed, the Plaintiffs had been investors with BLMIS for two decades, and

WNB had served as custodian of their investment accounts with BLMIS since

1999.  The gravamen of the Plaintiffs' claims is that, during its time as custodian,

WNB breached its contractual and common law duties to the Plaintiffs by relying

on information provided by BLMIS and making no effort to monitor BLMIS or

verify this information.  The Plaintiffs argue that WNB's failure to do so entitles

them to recover improperly assessed fees paid to WNB and lost investment

income which they could reasonably have anticipated earning if they had known

that BLMIS was a fraudulent enterprise instead of an investment firm.

       The parties have filed voluminous evidentiary submissions in the summary

judgment briefing process.  This ruling will briefly summarize this evidence,

reserving some facts for discussion of the merits of the parties' respective

motions.

       A.      <u>The Plaintiffs' custodial accounts with WNB.</u>

_____

       [2] The facts set forth in this section are undisputed unless otherwise noted.

The Plaintiffs were clients of PSCC, Inc. and PSCC Services, Inc. (collectively "PSCC"), pension and retirement plan consulting services companies operated by Robert L. Silverman.  (Pl.'s L.R. 56(a)(1) Stmt. ¶ 1.)  PSCC prepared retirement plans for the Plaintiffs, submitted the plans for approval to the IRS, and served as administrator of the Plaintiffs' plans.  (*Id.* ¶ 3.)  In 1986, Silverman entered into an arrangement with Madoff whereby PSCC clients would invest with BLMIS through an intermediary custodian of their assets; the intermediary custodian would hold an omnibus account at BLMIS composed of the combined investments of the PSCC clients.  (WNB's L.R. 56(a)(1) Stmt. ¶ 4.)

Initially, Westport Bank and Trust ("WBT") served as the intermediary custodian.  (*Id.*)  In 1999, after WBT was acquired by Hudson United Bank ("HUB"), HUB terminated the custodial arrangement with PSCC and BLMIS.  (*Id.* ¶ 8.)  PSCC approached WNB about serving as custodian of the PSCC clients' investments with BLMIS, and WNB agreed.  (*Id.*)  The Plaintiffs terminated their accounts at WBT and opened new accounts at WNB, and BLMIS transferred the assets in the omnibus account in WBT's name to a new omnibus account in WNB's name.  (*Id.* ¶¶ 9-10.)  At the time of the transfer, WNB did not audit the omnibus account or take any steps to verify that the omnibus account contained the assets reported by BLMIS and no funds were deposited in WNB.  (*See* Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 12-13.)

Like the other PSCC clients, the Plaintiffs entered into custodial agreements with WNB which governed the custodial relationship.  The

agreements provide that WNB will act as custodian with respect to all funds transmitted to WNB by Plaintiffs and invest Plaintiffs' funds in an omnibus account maintained at Bernard L. Madoff Investment Services, Inc. ("BLMIS"). (App. to WNB's L.R. 56(a)(1) Stmt. Ex. U, at 1.)  The agreements also provide that WNB has only a limited role in the Plaintiffs' investment strategy: "[WNB] has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS; . . . [WNB] is acting solely in a ministerial capacity; . . . [and WNB] assumes no responsibility for the investment performance of BLMIS."  (*Id*.)  But the agreements also provide that WNB has certain other responsibilities: WNB "shall maintain adequate records indicating the ownership by [the Plaintiffs] of investments with BLMIS and held by [WNB] as custodian for [the Plaintiffs]" and "shall render at least annually statements reflecting the property held by it as custodian hereunder."  (*Id*. at 2.)

The contracts also govern the Plaintiffs' payment of fees to WNB and PSCC; the fees due to both entities depended on the "average assets" held on behalf of the PSCC clients.  For services prior to December 31, 2004, PSCC received "an amount equal to .010 of the average assets (determined on an annual basis) held by [WNB] under this Custodian Agreement, plus .002 of the amount of each transaction effected by BLMIS on behalf of [the Plaintiffs] with a maximum of .025 of average assets."  (*Id*.)  For services after December 31, 2004, PSCC received "an amount equal to .006 of the assets at the time of billing held by [WNB] under this Custodian Agreement," plus any separately itemized

"administrative services."  (*Id*. at 3.)  WNB received "fees . . . of .006 of the average assets held hereunder (determined on an annual basis)."  (*Id*. at 2.)

**B.      WNB's administration of the Plaintiffs' accounts.**

WNB held the Plaintiffs' total assets in two types of investments: (1) the omnibus account with BLMIS, which held the Plaintiffs' investments in combination with the other PSCC clients, and (2) cash in multiple custodial services accounts at WNB which WNB used to receive deposits from investors, receive disbursements from BLMIS, and pay fees to itself and PSCC.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶¶ 1-3.)  The Plaintiffs therefore held proportionate investment interests in a common pool of assets composed of the omnibus account at BLMIS and the custodial services accounts at WNB.  (*Id*.)  WNB calculated the value of this proportionate investment interest in the common pool of assets, the net asset value ("NAV"), periodically.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶ 1; WNB's Supp. App. Ex. GG, at 101:22-102:3.)

WNB's fees, and part of PSCC's fees, were calculated based on the NAV of the combined pool of assets.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶ 1.)  WNB always maintained a cash balance in the custodial services accounts.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶ 3.)  WNB would adjust the balance based on anticipated future cash needs, but it typically did not exceed 0.5 percent of the total NAV of the PSCC clients' investments.  (WNB's Supp. App. Ex. GG, at 101:11-25.)

The Plaintiffs received annual statements from WNB.  (WNB's L.R. 56(a)(1) Stmt. ¶¶ 20, 24.)  These statements provided the total value of their investment,

the value of each share of their respective BLMIS investment, and number of shares owned, as well as with the market value of their investment one year earlier.  (App. to WNB's L.R. 56(a)(1) Stmt. Exs. J, K, L, S, T.)  The statements also detailed any additional investment by the Plaintiffs during the year (identified as a cash deposit followed by a purchase of shares in a BLMIS investment), as well as the fees deducted for payment to WNB and PSCC (identified as a sale of shares in a BLMIS investment followed by a deduction for administrative or record-keeping fees to PSCC or custodial fees to WNB).  (*Id.*)

      <u>C.</u>     <u>The aftermath of BLMIS' collapse.</u>

WNB asserts that Madoff was arrested, and his Ponzi scheme uncovered, on December 11, 2008.  At that time, it became clear that Madoff misappropriated assets as soon as they were deposited with BLMIS (App. to WNB's L.R. 56(a)(1) Stmt. Ex. A, ¶ 1), and that the trade confirmations and monthly account statements BLMIS sent to WNB had been fabricated (*id.* ¶ 2).  The omnibus account at BLMIS in WNB's name actually held no assets and had never held any assets.  (*Id.* ¶ 3.)

On December 12, 2008, WNB acknowledged, in a letter to all the PSCC clients including the Plaintiffs, the "recent allegations involving Bernard Madoff" and reminded Plaintiffs that, pursuant to their custodial agreements, they could request return of their assets by delivering the request to WNB.  (App. to WNB's L.R. 56(a)(1) Stmt. Exs. N, V.)  In connection with the liquidation of BLMIS pursuant to the Securities Investor Protection Act ("SIPA"), the individual

Plaintiffs filed claims with the SIPA trustee in the United States Bankruptcy Court for the Southern District of New York.  (Pl.'s Response to Def.'s Mot. for Summ. J. Ex. 3.)  WNB filed a statement in support of the claims submitted by the Plaintiffs and other PSCC clients.  (Pl.'s Response to Def.'s Mot. for Summ. J. Ex. 2.)  The SIPA trustee denied the Plaintiffs' claims in April 2011 because the Plaintiffs did not have accounts with BLMIS and therefore did not qualify for SIPA protection. (Pl.'s Response to Def.'s Mot. for Summ. J. Ex. 3.)

The Plaintiffs filed this lawsuit on December 2, 2009.  The Plaintiffs seek to recover their lost investment income and fees paid to WNB and PSCC.  (Compl. ¶¶ 35, 38, 46, 53.)  As of December 11, 2008, the reported value of the Plaintiffs' total investments with BLMIS exceeded $1.7 million.  (WNB's L.R. 56(a)(1) Stmt. ¶ 28.)  During the time that WNB served as custodian, it deducted over $100,000 in fees for itself and over $430,000 in fees for PSCC.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶¶ 4-8.)  Accordingly, the Plaintiffs seek damages in excess of $2 million. (Compl. ¶¶ 35, 38, 46, 53.)

## II.    Summary Judgment Standard

The standard for deciding the cross-motions for summary judgment is familiar.  Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  No genuine disputes as to any material fact exist, and summary judgment is therefore appropriate, when "the record taken as a whole could not lead a rational trier of fact to find for the

non-moving party."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).  A material fact is one which "might affect the outcome of the suit under the governing law," and an issue is genuine when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  But "[c]onclusory allegations will not suffice to create a genuine issue."  *Delaware & Hudson Ry. Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

On cross-motions for summary judgment, the same standard applies.  *See Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).  "The court must consider each motion independently of the other and, when evaluating each, the court must consider the facts in the light most favorable to the non-moving party."  *Natural Res. Def. Council v. Evans*, 254 F. Supp. 2d 434, 438 (S.D.N.Y. 2003) (citing *Morales*, 249 F.3d at 121).

## III.   Discussion

The parties principally dispute whether WNB's contractual and common law duties extended to verifying information reported by BLMIS, or at least doing more to attempt to verify information reported by BLMIS than it did.  Because this Court concludes that genuine issues of material fact exist as to whether WNB breached these duties and caused harm to the Plaintiffs as a result, summary judgment is not proper for either party on the Plaintiffs' breach of contract, breach of fiduciary duty, and professional negligence claims.  Because no reasonable factfinder could conclude, on this record, that WNB aided and abetted

any tortious conduct of BLMIS, Silverman, or PSCC, summary judgment for WNB is proper on the Plaintiffs' aiding and abetting breach of fiduciary duty and fraud claim.

WNB has also advanced a series of arguments which, it claims, limit its liability as a matter of law such that, at a minimum, partial summary judgment is appropriate on all claims made by one of the Plaintiffs and as to certain questions of damages.  Because triable issues exist with respect to WNB's arguments, none establishes partial summary judgment as appropriate.

This ruling will discuss the arguments with respect to each of the Plaintiffs' claims, as well as WNB's liability limiting arguments, in turn.

A.    Breach of Contract

The Plaintiffs argue that they are entitled to summary judgment on their breach of contract claim because WNB relied on fabricated account statements from BLMIS.  As a result, they claim, WNB breached the custodial agreements by improperly charging fees based on the value of fictitious assets and providing inaccurate records and statements.[3]  WNB argues that the contract permitted it to rely on BLMIS' account statements without any obligation to verify the statements or audit the assets BLMIS purportedly held.  This Court concludes that the custodial agreement is ambiguous on these matters.  This Court further

_____

[3] To the extent that the Plaintiffs argue that their breach of contract claim encompasses other conduct by WNB, this Court does not consider the arguments because the Plaintiffs failed to assert them either in the Plaintiffs' motion for partial summary judgment or in the opposition to WNB's motion for summary judgment.

concludes that the evidence in the summary judgment record creates a triable issue as to the proper interpretation of the contract, whether WNB breached the contract so interpreted, and whether the breach caused the Plaintiffs' damages.[4] Accordingly, summary judgment is not appropriate for either party.

In Connecticut,[5] a breach of contract action requires the plaintiff to show (1) a valid agreement, (2) performance by one party, (3) breach of the agreement by the opposing party and (4) damages directly and proximately caused by the breach. *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 504, 890 A.2d 140 (2006).

In determining whether breach has occurred, the court must ascertain the contractual rights and obligations of the parties.

> "In ascertaining the contractual rights and obligations of the parties, we seek to effectuate their intent, which is derived from the language employed in the contract, taking into consideration the circumstances of the parties and the transaction. . . .  Where the language is unambiguous, we must give the contract effect according to its terms. . . .  Where the language is ambiguous, however, we must construe those ambiguities against the drafter. . . .  [A] contract is

_____

[4] This Court does not consider the Plaintiffs' argument, raised for the first time in their reply brief in support of their motion for partial summary judgment, that they may recover fees paid to WNB on an unjust enrichment theory.  (Pl.'s Reply Br. in Support of Pl.'s Mot. for Partial Summ. J. at 5-9.)  The Plaintiffs did not plead an unjust enrichment claim.  (*See generally* Compl.); *see also Wright v. Ernst & Young LLP*, 152 F.3d 169, 178 (2d Cir. 1998) (citing *Jacobson v. Peat, Marwick, Mitchell & Co.*, 445 F. Supp. 518, 526 (S.D.N.Y. 1977)) ("party may not amend pleading through statements in briefs").

[5] None of the parties dispute that Connecticut substantive law applies to the custodial agreements.

> unambiguous when its language is clear and conveys a
> definite and precise intent . . . . The court will not
> torture words to impart ambiguity where ordinary
> meaning leaves no room for ambiguity . . . . Moreover,
> the mere fact that the parties advance different
> interpretations of the language in question does not
> necessitate a conclusion that the language is
> ambiguous . . . . In contrast, a contract is ambiguous if
> the intent of the parties is not clear and certain from the
> language of the contract itself . . . . [A]ny ambiguity in a
> contract must emanate from the language used by the
> parties . . . . The contract must be viewed in its entirety,
> with each provision read in light of the other provisions .
> . . and every provision must be given effect if it is
> possible to do so . . . . If the language of the contract is
> susceptible to more than one reasonable interpretation,
> the contract is ambiguous."

*Harbour Pointe, LLC v. Harbour Landing Condominium Ass'n, Inc.*, 300 Conn.

254, 260-61, 14 A.3d 284 (2011) (quoting *Cantonbury Heights Condominium*

*Ass'n, Inc. v. Local Land Development, LLC*, 273 Conn. 724, 734, 873 A.2d 898

(2005)). Where a contract term is ambiguous, the court may properly discern the

intent of the parties as to the meaning of the contract by considering extrinsic

evidence. *United Illuminating Co. v. Wisvest-Connecticut, LLC*, 259 Conn. 665,

675, 791 A.2d 546 (2002).

"[T]he test of proximate cause is whether the defendant's conduct is a

substantial factor in bringing about the plaintiff's injuries." *Gurguis v. Frankel*, 93

Conn. App. 162, 168, 888 A.2d 1083 (2006). "Proximate cause is ordinarily a

question of fact." *Id.*

  1. Calculation of fees based on "assets".

    a. Breach

The custodial agreement provides that WNB and PSCC will receive fees based on the assets held under the custodial agreement.  As to PSCC, the agreement provides for fees based on "average assets (determined on an annual basis) held by [WNB] under this Custodian Agreement" (App. to WNB's L.R. 56(a)(1) Stmt. Ex. U, at 2), or to "assets at the time of billing held by [WNB] under this Custodian Agreement" (*id*. at 3).  As to WNB, it provides for fees based on "average assets held hereunder (determined on an annual basis)."  (*Id*. at 2.)

The Plaintiffs argue that, when the contract uses the term "assets," it means *actual* assets held.  (*See* Pl.'s Mot. for Partial Summ. J. at 12-13.)  WNB argues that the term "assets" instead means the assets as *reported* by BLMIS. (*See* WNB's Reply to Pl.'s Response to WNB's Notice of Additional Authority at 1-2.)  The remaining contract language does not assist in resolving this issue.[6] (*See generally* App. to WNB's L.R. 56(a)(1) Stmt. Ex. U.)  This Court therefore

---

[6] The absence of any specific contract language on this point distinguishes this matter from *Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226 (D. Colo. 2011), and *Hines v. Fiserv, Inc.*, No. 8:08-cv-2569-T-30AEP, 2010 WL 1249838 (M.D. Fla. Mar. 25, 2010).  The plaintiffs in *Mandelbaum* and *Hines* also brought claims arising out of their losses from the collapse of BLMIS against Fiserv, Inc., an intermediary like WNB, but both plaintiffs had agreed to contracts which expressly stated that Fiserv, Inc. (or one of its subsidiaries), "does not conduct appraisals of investments and does not seek to verify the prices or values provided to it."  *Mandelbaum*, 787 F. Supp. 2d at 1251; *Hines*, 2010 WL 1249838, at *5.  This express provision was fatal to the plaintiffs' breach of contract claims because the relevant contract disclaimed any obligation to audit, appraise, or verify asset values as reported by BLMIS.  Mandelbaum, 787 F. Supp. 2d at 1251; Hines, 2010 WL 1249838, at *5.  No similar contract language exists here.  (*See generally* App. to WNB's L.R. 56(a)(1) Stmt. Ex. U.)  Although WNB urges this Court to read similar language into the custodial agreement here, this Court declines to do so.

-12-

concludes that the contract term "assets" is susceptible of both readings and is therefore ambiguous.

WNB, citing to *Anwar v. Fairfield Greenwich Ltd.*, ___ F. Supp. 2d ___, No. 09-cv-118, 2011 WL 6288406 (S.D.N.Y. Dec. 14, 2011), argues that the contract term "assets" unambiguously means the value of assets reported by BLMIS. (WNB's Notice of Additional Authority and Supp. Br. at 1-3.)  The *Anwar* court, on a motion to dismiss claims similar to those the Plaintiffs brought here, held that a contract which called for an intermediary to assess fees based on "month-end NAV of the Shares [of a hedge fund invested in BLMIS]" unambiguously permitted the intermediary to assess fees based on NAV as reported to it.  2011 WL 6288406, at *5-6.  The reasoning in this decision does not resolve the matter of contract interpretation here.[7]

In *Anwar*, the relationship between the intermediary bank defendant, BLMIS, and the plaintiff seeking to recover fees on a breach of contract theory was meaningfully different.  The intermediary bank defendant had custody of the plaintiff's investment in a hedge fund which, in turn, invested with BLMIS.  *Id.* at *6.  The court interpreted NAV, net asset value, as a term of art which, when concerning the assets of a hedge fund, means a value calculated and promulgated by the hedge fund.  *Id.*  Using this interpretation, the court concluded that the plaintiffs could not reasonably have expected that the

---

[7] Even if <u>Anwar</u> were indistinguishable from this matter, it would not be binding authority upon this Court.

intermediary bank would calculate its fees based on any figure other than the NAV reported by the hedge fund.  *Id.* at *6-7.

Here, WNB's position is not equivalent to that of the intermediary in *Anwar*. Unlike the intermediary in *Anwar*, WNB had the responsibility to calculate the NAV of a basket of investments which included BLMIS shares held by WNB in the BLMIS omnibus account as well as other assets, namely the cash accounts at WNB.  2011 WL 6288406, at *6; (WNB's Supp. L.R. 56(a)(1) Stmt. ¶¶ 1-3.)  And unlike the intermediary in *Anwar*, WNB contracted to base its fees on "assets," not the "NAV of the Shares [held by WNB as custodian]."  *Compare* 2011 WL 6288406, at *5 *with* (App. to WNB's L.R. 56(a)(1) Stmt. Ex. U, at 2).

Moreover, WNB's position is analogous to that of the hedge fund in *Anwar*. Like the hedge fund in *Anwar*, WNB held multiple investments in which the Plaintiffs had proportionate interests.  2011 WL 6288406, at *6; (WNB's Supp. L.R. 56(a)(1) Stmt. ¶¶ 1-3.)  Like the hedge fund in *Anwar*, WNB calculated the NAV of these investments regularly.  *See* 2011 WL 6288406, at *6; (WNB's Supp. L.R. 56(a)(1) Stmt. ¶ 1; WNB's Supp. App. Ex. GG, at 101:22-102:3, 106:14-20.) Accordingly, because *Anwar* resolved claims against an intermediary which did not calculate its own NAV and contractually based its fees on the value of shares in the hedge fund, and because *Anwar* did not address claims against the hedge fund itself, *Anwar* does not resolve the contract interpretation dispute here.

The terms of the custodial agreements therefore do not conclusively resolve whether the term "assets" means actual assets or reported assets.  In the

absence of a clear, unambiguous meaning for the term "assets," this Court could nonetheless conclude that summary judgment is proper if sufficient extrinsic evidence exists to demonstrate the parties' intent conclusively. *See Compagnie Financiere de CIC et de L'Union Europeenne v. Merrill Lynch, Pierce, Fenner & Smith Inc.* (*Compagnie Financiere*), 232 F.3d 153, 157-58 (2d Cir. 2000); *Murtha v. City of Hartford*, 303 Conn. 1, 8, 35 A.3d 177 (2011) ("When the language of a contract is ambiguous, . . . the determination of the parties' intent is a question of fact."). This Court concludes that the evidence is not so conclusive as to warrant summary judgment for either party.

The Plaintiffs point to certain evidence which suggests that WNB reserved the right to audit the investments in BLMIS, but apparently never did so.[8] (Pl.'s L.R. 56(a)(1) Stmt. ¶ 29; Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 23, 84.)[9] Because it did

---

[8] WNB objects to consideration of this evidence, contained in an Office of the Comptroller of the Currency ("OCC") report which, itself, draws on internal WNB documents to support this factual assertion, because it is hearsay within hearsay. This argument fails. The OCC report is clearly a public record and excepted from the hearsay rule by Rule 803(8). Fed. R. Evid. 803(8). The underlying statements are drawn from or incorporated into a contract between WNB and PSCC and are therefore not hearsay. *See New Era Publications Intern., ApS v. Henry Holt & Co.*, 873 F.2d 576, 592 (2d Cir. 1989) ("[W]ords of independent legal significance, such as a contract or slander, are verbal acts and not hearsay."). Even were these statements hearsay, WNB, by providing them to its federal regulator in the formal examination process, manifested that it believed them to be true, excluding them from the operation of the hearsay rule. *See* Fed. R. Evid. 801(d)(2)(B).

[9] Exhibit H is composed of excerpts from the transcript of the deposition of Donald Moore, an expert report prepared by Moore which was an exhibit at his deposition, and several documents prepared by the OCC regarding examinations of WNB and CCB. The documents in Exhibit H bear several conflicting page numbers, so this ruling refers to specific pages in Exhibit H as though it were

not do so, WNB's federal bank regulator, the Office of the Comptroller of the

Currency ("OCC"), concluded that WNB's management lacked sufficient controls

over its relationship with BLMIS.  (Pl.'s L.R. 56(a)(1) Stmt. ¶ 33; Pl.'s L.R. 56(a)(1)

Stmt. Ex. H, at 84.)  This evidence suggests that WNB and the OCC interpreted

WNB's obligations under the contract as extending to auditing or verifying

BLMIS' reported asset values to some extent.[10]  Similarly, evidence that WNB did

take some steps to verify the BLMIS statements tends to suggest that WNB

believed it had some obligation to do so.  (WNB's Supp. App. Ex. GG, at 119:21-

120:5.)  Viewed in the light most favorable to the Plaintiffs, this evidence creates

triable issues with respect to whether WNB had a duty to ascertain the actual

existence and value of assets held by BLMIS and whether the contract term

"assets" means actual assets such that summary judgment is not proper for

WNB on this claim.

WNB counters with evidence that the relevant contract between WNB and

---

consecutively numbered as a whole.

[10] Such an interpretation would be consistent with official OCC guidance
that "[b]anks should make certain that they have the right to audit third parties
(and their subcontractors) as needed to monitor performance under the
contract."  OCC Bulletin 2001-47, 2001 WL 1471709, at *9 (Office of the
Comptroller of the Currency, Nov. 1, 2001).  This Court may take judicial notice of
the 2001 OCC Bulletin because it is a public record of a federal regulatory
agency, available on the OCC website and on Westlaw, and because the parties
and at least one expert witness manifestly relied upon it during this litigation.
*See* Fed. R. Evid. 201; *Rothman v. Gregor*, 220 F.3d 81, 92 (2d Cir. 2000).

BLMIS says nothing about a right to an audit.[11]  (Second Supp. Merschman Aff. Ex. 2.)[12]  WNB also relies on evidence that no relevant federal agency ever directed or mandated that WNB audit or verify BLMIS' reported asset values and evidence that none of BLMIS' other investors ever conducted such a verification or audit.  (WNB's L.R. 56(a)(1) Stmt. ¶¶ 39-40.)  Viewed in the light most favorable to WNB,  this evidence amplifies the existence of a triable issue with respect to whether the contract term "assets" means reported assets such that summary judgment is not proper for the Plaintiffs on this claim.

Whether viewed in the light most favorable to the Plaintiffs or WNB, a genuine issue of material fact exists based on the extrinsic evidence of the meaning of the ambiguous contract term "assets."  Sufficient triable issues therefore exist to preclude summary judgment for either party on this claim.

### b.    Causation

WNB further argues that, even if it breached the custodial agreements by paying BLMIS fees based on reported assets instead of actual assets, the Plaintiffs cannot succeed on their claim because they cannot show that this

---

[11] Although the Plaintiff set forth WNB's right to audit in its Local Rule 56 statement, WNB interposed an objection to the evidence the Plaintiffs cited in support without controverting the asserted fact in conformity with Local Rule 56(a)(3).  (See WNB's L.R. 56(a)(2) Stmt. ¶ 29.)  WNB did not submit this evidence until later in the summary judgment briefing process.  Rather than deeming WNB to have admitted this fact, this Court considers this evidence properly before it.

[12] The contract between BLMIS and WNB which WNB submitted as an exhibit here is undated.  (See Second Supp. Merschman Aff. Ex. 2, at 3-6.)  The OCC report refers to a document dated May 20, 1999 and an agreement between WNB and PSCC.  (Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 84.)

breach caused them any damages.  (WNB's Opp. to Pl.'s Mot. for Partial Summ. J. at 22-28.)  WNB claims that the Plaintiffs cannot show that any breach proximately caused them damages because the Plaintiffs only "paid" fees in the sense that WNB sold the Plaintiffs' worthless BLMIS shares in proportion to the fees owed.  (*Id.* at 27.)

"[T]he test of proximate cause is whether the defendant's conduct is a substantial factor in bringing about the plaintiff's injuries."  *Gurguis*, 93 Conn. App. at 168.  WNB concedes, as it must, that "[p]roximate cause is ordinarily a question of fact."  *Id.*  This Court concludes that it is such a question here too and that summary judgment is not proper on this basis.

It is undisputed that WNB actually received in excess of $100,000 in connection with performing custodial services for the Plaintiffs.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶¶ 4-8.)  It is equally undisputed that the Plaintiffs contributed money to their investment accounts with the reasonable expectation that it would appreciate in value and not be stolen.  (WNB's L.R. 56(a)(1) Stmt. ¶¶ 13-24.)  This Court has already concluded that the Plaintiffs have raised a triable issue as to whether WNB rightfully received as much in fees as it did.  If WNB wrongfully received fees, then the money rightfully belongs to someone else, and WNB's improper fees would constitute a substantial factor in their loss to that person. The Plaintiffs' evidence creates a triable issue as to the source of the fees paid to WNB as well as whether at least some of the money WNB received as fees is attributable to the Plaintiffs' contributions to their accounts.  (*See* WNB's L.R.

56(a)(1) Stmt. ¶¶ 13-24; WNB's Supp. L.R. 56(a)(1) Stmt. ¶¶ 4-8.)  Accordingly, the evidence shows a genuine factual dispute about whether and to what extent WNB's improper fees rightfully belong to the Plaintiffs.  Summary judgment is not warranted in WNB's favor on the issue of proximate causation.

>          2.     CCB's failure to maintain adequate records and statements.

The custodial agreement provides that WNB "shall maintain adequate records indicating the ownership by [the Plaintiffs] of investments with BLMIS and held by [WNB] as custodian for [the Plaintiffs]" and "shall render at least annually statements reflecting the property held by it as custodian hereunder." (App. to WNB's L.R. 56(a)(1) Stmt. Ex. U, at 2.)

As with the propriety of WNB's fees based on the contractual term "assets," the parties disagree about the proper interpretation of the terms "adequate records" and "statements reflecting the property held . . . as custodian."  The Plaintiffs argue that adequate records and statements reflecting the property in which they had an interest would have shown that the Plaintiffs owned nothing because BLMIS was a fraud.  (*See* Pl.'s Mot. for Partial Summ. J. at 12-18.)  WNB argues that these terms instead mean records and statements based on the information reported by BLMIS.  (*See* WNB's Opp. to Pl.'s Mot. for Partial Summ. J. at 17-18.)  Again, the remaining contract language does not assist in resolving this issue.[13]  (*See generally* App. to WNB's L.R. 56(a)(1) Stmt.

---

[13] Again, no specific language disclaiming any responsibility to audit or verify the statements WNB received from BLMIS appears in the custodial agreements.  (*See generally* App. to WNB's L.R. 56(a)(1) Stmt. Ex. U.)

Ex. U.)

This Court therefore concludes that the contract terms "adequate records" and  "statements reflecting the property held . . . as custodian" are susceptible of both readings and are therefore ambiguous.  Because insufficient extrinsic evidence exists to demonstrate conclusively the parties' intent with respect to these ambiguous contract terms, summary judgment is not warranted for either party.  *See Compagnie Financiere*, 232 F.3d at 157-58; *Murtha*, 303 Conn. at 8.

The Plaintiffs again point to the evidence which suggests that WNB could have audited the investments in BLMIS, did not do so, and lacked proper internal controls as a result.  (Pl.'s L.R. 56(a)(1) Stmt. ¶ 29; Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 23, 84; WNB's Supp. App. Ex. GG, at 119:21-120:5.)  The Plaintiffs also point to the testimony of WNB's expert witness with respect to WNB's obligation to "[a]t least provide the statement.  You would expect it to be accurate, you would expect it to be timely to the best of their ability."  (Pl.'s L.R. 56(a)(1) Stmt. Ex. J, at 117:21-23.)  Viewed in the light most favorable to the Plaintiffs, this evidence creates a triable issue with respect to whether the contract terms "adequate

---

*Mandelbaum* and *Hines* are again distinguishable on this basis, *see Mandelbaum*, 787 F. Supp. 2d at 1251; *Hines*, 2010 WL 1249838, at *5, and the Court declines to read similar disclaimer language into the custodial agreement here, *see* note 5, *supra*.  To the extent that WNB relies upon the custodial agreement's disclaimer of any "authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS," this Court rejects the argument because the contract term addresses itself to WNB's role in BLMIS' discretionary investment decisions, not whether WNB had an obligation to take at least some steps to verify that BLMIS was making discretionary investments at all.  (*See* App. to WNB's L.R. 56(a)(1) Stmt. Ex. U., at 1.)

records" and "statements reflecting the property held . . . as custodian" mean records and statements which reflected that the Plaintiffs' BLMIS investments did not exist.[14]  Summary judgment is not proper for WNB on this claim.

WNB argues, not without persuasive force, that the Plaintiffs' proffered interpretation is unreasonable because WNB would incur liability for failing to uncover the Madoff Ponzi scheme before law enforcement and the rest of BLMIS' investors.  (WNB's Mem. in Support of Mot. for Summ. J. at 16; *see* WNB's L.R. 56(a)(1) Stmt. ¶ 40.)  WNB also again relies on evidence that relevant authorities never directed or mandated that WNB audit or verify BLMIS' periodic statements. (WNB's L.R. 56(a)(1) Stmt. ¶ 39.)  Viewed in the light most favorable to WNB,  this evidence creates a triable issue with respect to whether the records and statements which WNB provided complied with the custodial agreement's records and statements terms.  Summary judgment is not proper for the Plaintiffs on this claim.

Whether viewed in the light most favorable to the Plaintiffs or WNB, a genuine issue of material fact exists based on the extrinsic evidence of the meaning of the ambiguous contract terms "adequate records" and "statements reflecting the property held . . . as custodian."  Sufficient triable issues therefore

---

[14] To the extent that the Plaintiffs rely on 26 U.S.C. §§ 408(i), 6704(a) (2006) to establish that the contract required WNB to provide records and statements which reflected that the Plaintiffs' BLMIS investments did not exist, this Court does not address the argument.  To the extent that the Plaintiffs rely on these statutory provisions as an independent claim for relief, this Court rejects the argument because the Plaintiffs did not plead such a claim.  (*See generally* Compl.)

exist to preclude summary judgment for either party on this claim.

    **B.**    **Breach of fiduciary duty.**

    WNB argues that its undisputed status as custodian of the Plaintiffs' investments, not as an investment advisor, necessarily means that the WNB had no fiduciary duty to the Plaintiffs at all.  This Court disagrees and concludes that the record contains triable factual issues with respect to whether WNB bore any fiduciary duties to the Plaintiffs and whether WNB breached any such duties. Accordingly, summary judgment for WNB on this claim is not warranted.

    "[A] fiduciary or confidential relationship is characterized by a unique degree of trust and confidence between the parties, one of whom has superior knowledge, skill or expertise and is under a duty to represent the interests of the other."  *Sherwood v. Danbury Hosp.*, 278 Conn. 163, 195, 896 A.2d 777 (2006) (quoting *Biller Assocs. v. Peterken*, 269 Conn. 716, 723, 849 A.2d 847 (2004)). "Although [the Connecticut Supreme Court has] not *expressly* limited the application of these traditional principles of fiduciary duty to cases involving only fraud, self-dealing or conflict of interest, the cases in which we have invoked them have involved such deviations."  *Id.* (quoting *Murphy v. Wakelee*, 247 Conn. 396, 400, 721 A.2d 1181 (1998)) (emphasis in original).

    Genuine factual issues exist as to whether a fiduciary relationship existed between WNB and the Plaintiffs.  It is undisputed that WNB calculated the basis for its own fees, the NAV of the custodial accounts.  (WNB's Supp. L.R. 56(a)(1) Stmt. ¶ 1; WNB's Supp. App. Ex. GG, at 101:22-102:3, 106:14-20.)   It did so based

on information which was unavailable to the Plaintiffs: the transaction reports which came directly from WNB and the cash balance in the custodial services accounts.  (Pl.'s L.R. 56(a)(1) Stmt. Ex. C, at 100:5-19, 120:18-121:17.)  Viewed in the light most favorable to the Plaintiffs, this evidence creates a triable issue with respect to whether this arrangement had the requisite trust, knowledge disparity, and duty to represent the Plaintiff's interests with respect to the calculation of the NAV of the Plaintiffs' investment accounts to give rise to a fiduciary duty.[15]  *See Albuquerque v. Albuquerque*, 42 Conn. App. 284, 287, 679 A.2d 962 (1996) ("Whether . . . a [fiduciary] relationship exists is a factual question for the trial court.").

Further, genuine factual issues exist as to whether WNB breached any such fiduciary duties.  WNB's federal regulator advised, if not mandated, that "[b]anks should make certain that they have the right to audit third parties (and their subcontractors) as needed to monitor performance under the contract," OCC Bulletin 2001-47, 2001 WL 1471709, at *9 (Office of the Comptroller of the Currency, Nov. 1, 2001), and evidence in the record suggests that WNB had such

---

[15] WNB argues, and this Court agrees, that the custodial agreement unambiguously provides that WNB is not an investment advisor, has not directed the Plaintiffs to invest with BLMIS, and assumes no responsibility for the performance of BLMIS investments.  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. U, at 1.)  WNB therefore bore no fiduciary duty arising out of the Plaintiffs' selection of BLMIS as an investment.  But the contract also created the arrangement where WNB would calculate the NAV of the Plaintiffs' investments based on information unavailable to the Plaintiffs.  (*See id.*)  Without any language specifically disclaiming a fiduciary relationship based on this aspect of the arrangement, the custodial agreement does not preclude the existence of such a relationship and a resulting duty of loyalty to the Plaintiffs in the calculation of the NAV.

a right with respect to the BLMIS investments, (Pl.'s L.R. 56(a)(1) Stmt. ¶ 29; Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 84).  The evidence also shows that the Plaintiffs did not receive the detailed statements from BLMIS that WNB received, and one can reasonably infer from this evidence that the Plaintiffs, because they did not have accounts at BLMIS, also lacked the ability to audit or investigate BLMIS.  (Pl.'s L.R. 56(a)(1) Stmt. Ex. C, at 100:5-19, 120:18-121:17; Pl.'s L.R. 56(a)(1) Stmt. Ex. K, at 12.)  Evidence in the summary judgment record also suggests that WNB adopted certain policies which systematically overstated the NAV of the custodial accounts.  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. F, at 104:6-107:1; Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 83-84.)

Viewed in the light most favorable to the Plaintiffs, this evidence raises genuine issues of material fact about whether WNB breached any fiduciary duty to the Plaintiffs.  If the Plaintiffs can show at trial that WNB had the ability to audit or verify the BLMIS assets and failed to do so, a reasonable juror could conclude that such a failure breached a fiduciary obligation to represent the Plaintiffs' interest when the Plaintiffs, without access to the BLMIS statements or the ability to audit or investigate BLMIS, could not do so themselves.  Similarly, if the Plaintiffs can show at trial that WNB adopted policies and practices which systematically overstated the NAV of the custodial accounts and, as a result, its own fees, then a reasonable juror could find the requisite self-dealing and conflict of interest to sustain liability for breach of fiduciary duty.

This record therefore contains triable factual issues with respect to

whether WNB bore any fiduciary duties to the Plaintiffs and whether WNB breached any such duties.  Summary judgment in WNB's favor on this claim is not proper.

       **C.**    **Professional negligence.**

WNB argues that it is entitled to summary judgment on the Plaintiffs' professional negligence claim because (1) it owed the Plaintiffs no duty to monitor, verify, or audit their investments with BLMIS, and (2) any breach of WNB's duty could not have caused the Plaintiffs' damages.  (WNB's Mem. in Support of Mot. for Summ. J. at 30-37.)  This Court concludes that the record contains triable factual issues with respect to what the relevant professional standard of care is in this matter and whether any breach by WNB caused the Plaintiffs' damages.  Summary judgment on this claim is not proper.

"The essential elements of a cause of action in negligence are well established: duty; breach of that duty; causation; and actual injury."  *Pelletier v. Sordoni / Skanska Constr. Co.*, 286 Conn. 563, 593, 945 A.2d 388 (2008).  In order to prevail on a professional negligence claim, a plaintiff must prove: (1) the relevant standard of care in the circumstances, (2) a deviation from the standard of care, and (3) harm caused by the deviation.  *Pisel v. Stamford Hosp.*, 180 Conn. 314, 334-42, 430 A.2d 1 (1980).  Expert testimony is typically required to establish these elements.  *Mather v. Griffin Hosp.*, 207 Conn. 125, 130-31, 540 A.2d 666 (1988).  Unlike breach of fiduciary duty claims, professional negligence claims implicate only a duty of care, rather than a duty of loyalty and honesty.  *Beverly*

*Hills Concepts, Inc. v. Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 56-57, 717 A.2d 724 (1998).

      1.    Duty / Standard of care

Although WNB argues that it had no legal duty to monitor, verify, or audit the Plaintiffs' investments with BLMIS, as an entity rendering professional services[16] to the Plaintiffs it cannot plausibly assert that it owed the Plaintiffs no duty whatsoever to act with reasonable care under the circumstances. *See Vona v. Lerner*, 72 Conn. App. 179, 187, 804 A.2d 1018, 1023 (2002) ("[P]rofessional negligence or malpractice . . . [is] defined as the failure of one rendering professional services to exercise that degree of skill and learning commonly applied under all the circumstances in the community by the average prudent reputable member of the profession.") (internal quotations omitted, emphasis deleted).  This Court therefore construes WNB's argument as asserting that the standard of care in these circumstances did not extend to monitoring, verifying, or auditing the Plaintiffs' investments with BLMIS.

Evidence that the proper standard of care did so extend exists in the record.  One of the Plaintiffs' expert witnesses so testified.  (Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 31:19-45:18; App. to WNB's L.R. 56(a)(1) Stmt. Ex. F, at 31:15-33:12, 41:12-43:19, 45:19-47:1.)  Guidance issued by the Office of the Comptroller of the Currency also suggests that the proper standard of care for an entity like

---

      [16] WNB has not argued that it did not render "professional services" so as to escape liability for professional negligence.

WNB extended to auditing a third party like BLMIS.[17]  *See* OCC Bulletin 2001-47, 2001 WL 1471709, at *9 (Office of the Comptroller of the Currency, Nov. 1, 2001) ("Banks should make certain that they have the right to audit third parties (and their subcontractors) as needed to monitor performance under the contract."). Viewed in the light most favorable to the Plaintiffs, a genuine issue of fact exists as to whether the standard of care in these circumstances included monitoring, verifying, or auditing the Plaintiffs' investments with BLMIS.

> 2.    Causation

WNB invokes the well-established superseding cause rule to argue that Madoff's intentional fraudulent and criminal acts broke the chain of causation and relieve WNB, as a matter of law, from any liability for the Plaintiffs' damages even if it acted negligently.  WNB concedes, as it must, that "an intervening intentional or criminal act relieves a negligent defendant of liability, except where the harm caused by the intervening act is within the scope of risk created by the defendant's conduct *or* where the intervening act is reasonably foreseeable." *Medcalf v. Washington Heights Condo. Ass'n, Inc.*, 57 Conn. App. 12, 17, 747 A.2d 532, 536 (2000) (emphasis added).

Here, the record contains some evidence that fraud or misconduct on the part of a third-party partner is within the scope of risk of having inadequate

---

[17] Although the Plaintiffs do not argue that the OCC Bulletin is binding law or that it creates any duties by itself, this Court concludes that the contents of the Bulletin are relevant to establishing WNB's standard of care in these circumstances.

controls or monitoring of the third-party's conduct.  *See* OCC Bulletin 2001-47, 2001 WL 1471709, at *9 (Office of the Comptroller of the Currency, Nov. 1, 2001) ("[Compliance] risk exists when products, services, or systems associated with the third-party relationship are not properly reviewed for compliance, *or when the third party's operations are not consistent with law, ethical standards, or the bank's policies and procedures*.  The potential for serious or frequent violations or noncompliance exists when a bank's oversight program does not include appropriate audit and control features, particularly when the third party is implementing new bank activities or expanding existing ones.") (emphasis added).  Evidence in the record also tends to show that WNB's relationship with BLMIS involved "significant risk."  (Pl.'s L.R. 56(a)(1) Stmt. ¶¶ 34-35; *see also* Pl.'s L.R. 56(a)(1) Stmt. Ex. H, at 85.)

Construing this evidence in the Plaintiffs' favor, a genuine issue of fact exists as to whether the intervening act of BLMIS' fraud fell within the scope of risk of any negligent conduct by WNB such that the fraud did not break the chain of causation between WNB's claimed negligence and the harm to the Plaintiffs.  Summary judgment is therefore not proper on the Plaintiffs' professional negligence claim based on an inability to show proximate causation.[18]

**D.**    **Aiding and abetting breach of fiduciary duty and fraud.**

---

[18] To the extent that WNB relies on evidence that no verification or monitoring program could have uncovered the BLMIS fraud, this Court concludes that the evidence in the record is inconclusive and that the issue is properly one for the jury.  (*See* WNB's L.R. 56(a)(1) Stmt. ¶ 42; Pl.'s L.R. 56(a)(2) Stmt. ¶ 42.)

WNB argues that summary judgment in its favor on the Plaintiffs' aiding and abetting breach of fiduciary duty and fraud claim is appropriate because (1) WNB lacked knowledge of any underlying tortious conduct by Silverman, PSCC, or BLMIS, and (2) WNB did not provide substantial assistance to any such tortious conduct.  (WNB's Mem. in Support of Mot. for Summ. J. at 38-43.)  This Court agrees with WNB with respect to the knowledge element of aiding and abetting liability and concludes that summary judgment in WNB's favor on this claim is proper.

In order to show aiding and abetting liability in Connecticut, a plaintiff must show: "(1) the party whom the defendant aids [performed] a wrongful act that cause[d] an injury; (2) the defendant [was] generally aware of his role as part of an overall illegal or tortious activity at the time that he provides the assistance; (3) the defendant . . . knowingly and substantially assist[ed] the principal violation."  *Efthimiou v. Smith*, 268 Conn. 499, 505, 846 A.2d 222, 226 (2004) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)).  In order to be "generally aware," an aider or abetter must have actual knowledge of the underlying tort or act with reckless indifference to the possibility that the underlying tort is occurring.  *Master-Halco, Inc. v. Scillia Dowling & Natarelli, LLC*, 739 F. Supp. 2d 109, 121 (D. Conn. 2010) (citing *Fidelity Nat'l Title Ins. Co. v. Kissel*, No. X04CV065002386S, 2008 WL 4151299, at *2 (Conn. Super. Aug. 18, 2008); *Brunette v. Bristol Sav. Bank*, No. CV 92–0453957S, 1994 WL 468448 (Conn. Super. Aug. 22, 1994); *FDIC v. Romaniello*, No. CV 92–0294248, 1992 WL

369557 (Conn. Super. Dec. 3, 1992).

Here, the record contains no specific evidence which could establish that WNB knew that BLMIS was a fraud or was recklessly indifferent to such a possibility. The Plaintiffs rely on evidence that WNB failed to audit or verify BLMIS' reported assets, promulgated inaccurate records, and did not become suspicious when BLMIS refused WNB electronic access to its account at BLMIS or insisted that WNB have no contact with it or the PSCC clients. (Pl.'s Opp. to WNB's Mot. for Summ. J. at 37-38.) Although this Court has concluded that evidence in the record creates a genuine issue of fact as to WNB's negligence, mere negligence is not sufficient for aiding and abetting liability purposes. *See Master-Halco, Inc.*, 739 F. Supp. 2d at 121. No evidence establishes WNB's actual knowledge of the Madoff fraud or reckless indifference to the possibility that it was occurring. No factual basis therefore exists for the Plaintiffs' claim that WNB aided and abetted the Madoff fraud.

In addition, the record similarly contains no specific evidence which could establish that WNB knew that Silverman or PSCC were acting improperly or was recklessly indifferent to such a possibility. The Plaintiffs do not offer any evidence that WNB knew, or recklessly disregarded the possibility, that Silverman's fees exceeded industry custom (or that his fees exceeded industry custom at all), that Silverman was not registered as an investment advisor, that Silverman concealed misgivings about the custodial relationship aired by other banks he approached about taking over the custodial arrangement from WBT, or

that Silverman had not conducted any due diligence on Madoff or BLMIS.  (*See* Pl.'s Opp. to WNB's Mot. for Summ. J. at 40-42.)  Viewed in the light most favorable to the Plaintiffs, the evidence only creates a triable issue with respect to WNB's negligence, and negligence is not sufficient for aiding and abetting liability purposes.  *See Master-Halco, Inc.*, 739 F. Supp. 2d at 121.

This record therefore contains no evidence from which a reasonable juror could conclude that WNB knew, or recklessly disregarded the possibility, that BLMIS, Silverman, or PSCC were breaching fiduciary duties to the Plaintiffs or committing fraud.  Summary judgment on the Plaintiffs' aiding and abetting claim is appropriate.

E.      **WNB's limited liability arguments**.

1.      Limited liability to the Faye S. Albert Retirement Plan

WNB argues that the claims of one of the Plaintiffs, the Faye S. Albert Retirement Plan (the "Plan"),[19] are barred by the contractual provisions in the Plan's governing documents (the "Plan Document" and the "Adoption Agreement") which limit the liability of the Plan's "custodian" in various ways. (WNB's Opp. to Pl.'s Mot. for Partial Summ. J. at 29-30.)  Because WNB is not a party to the Plan Document or the Adoption Agreement, and because there is no evidence in the record that the parties to the Plan Document and the Adoption Agreement intended that WNB benefit from the limited liability provisions granted

---

[19] Although the Plan is not formally a party to this action, Faye S. Albert, as trustee of the Plan, is.

to the Plan "custodian," this argument fails.

First, WNB cannot be the "custodian" of the Plan because it is not a party to the Plan Document or the Adoption Agreement.  Section 10.03 of the Plan Document provides, in relevant part, that "[t]he Employer may appoint a Custodian under the Plan, the acceptance by the Custodian indicated on the execution page of the Adoption Agreement."  (WNB's Supp. App. Ex. MM, at 933.)[20]  The execution page of the Adoption Agreement contains no acceptance by WNB or any other custodian, nor does it contain any reference at all to WNB or any other custodian.  (*Id.* at 967.)  Nor has WNB presented any evidence to suggest the parties to the Plan Document or the Adoption Agreement intended that WNB serve as the"custodian" as defined by and referenced in those agreements.[21]  It follows that WNB was not a party to those agreements, is not the "custodian" of the Plan, and cannot enforce those agreements' limitations on the liability of the "custodian."

Second, WNB has presented no evidence that it is a third-party beneficiary of the Plan Document and the Adoption Agreement.  "[T]he only way a contract could create a direct obligation between a promisor and a third party beneficiary would have to be . . . because the parties to the contract so intended."  *Dow &*

---

[20] Exhibit MM is composed of several different documents bearing several conflicting page numbers, so this ruling refers to specific pages in Exhibit MM by their document production number in the lower right-hand corner.

[21] None of the parties dispute that WNB is the custodian of the Plaintiffs' custodial accounts pursuant to the custodial agreements.

*Condon, Inc. v. Brookfield Development Corp.*, 266 Conn. 572, 580–81, 833 A.2d 908 (2003).[22]  "[I]ntent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties."  *Id.* at 580.  WNB has presented no evidence that the parties to the Plan Document and the Adoption Agreement intended to create a direct obligation to WNB limiting its liability.  Nor has WNB presented any evidence of the motives and purposes of the parties to the contract or the circumstances of its making which would permit an inference that such intent existed.  Instead, the execution page of the Adoption Agreement, lacking any mention of a "custodian," tends to show that the parties to the Plan Document and the Adoption Agreement intended that there be no "custodian" of the Plan at all.  (WNB's Supp. App. Ex. MM, at 967.)  Without any evidence of an intent by the parties to the Plan Document and the Adoption Agreement to allow WNB to benefit from the "custodian's" limited liability, WNB cannot enforce the Plan Document and the Adoption Agreement as a third-party beneficiary.

  2.    Damages

  WNB, citing to Federal Rule of Civil Procedure 56(g), argues that this Court

---

  [22] Although the Plaintiffs argue that Florida law governs the interpretation of the Plan Document and the Adoption Agreement, the Court need not resolve this choice of law issue because the same result would inure under Florida law as under Connecticut law.  *See Land & Sea Petroleum, Inc. v. Business Specialists, Inc.*, 53 So.3d 348, 355 (Fla. 4th Dist. Ct. App. 2011) ("A party is a third-party beneficiary of a contract only if both parties to the contract express an intent to primarily and directly benefit the third party or a class of persons to which that party claims to belong.").

should limit the damages available to the Plaintiffs so as to exclude (1) money the Plaintiffs invested before WNB became custodian, and (2) fictitious profits reported by BLMIS.  (WNB's Mem. in Support of Mot. for Summ. J. at 8-14.)   This Court concludes that triable issues exist with respect to the availability of both categories of damages based on the Plaintiffs' claims.  Summary judgment excluding such damages from the jury's consideration is therefore not proper.

> a.      Investments before WNB became custodian

WNB argues that, as a matter of law, it cannot have proximately caused the loss of money the Plaintiffs contributed to their accounts prior to WNB becoming custodian of the accounts.  Again, "[p]roximate cause is ordinarily a question of fact."  *Gurguis*, 93 Conn. App. at 168.  This Court concludes that it is so here.

WNB's argument relies on its assertion that nothing it could have done after assuming the custodian role could have recovered money which Madoff had already stolen.  (WNB's Mem. in Support of Mot. for Summ. J. at 9-10.)  Evidence in the record indicates that WNB continued to withdraw money from BLMIS through at least 2007, long after it became custodian (Am. Gard Aff. Ex. B, at 1-2.), that the Plaintiffs knew they could request that WNB withdraw their investments from BLMIS (App. to WNB's L.R. 56(a)(1) Stmt. Ex. H, at 57:6-8.), and that WNB offered the Plaintiffs the opportunity to withdraw their money from BLMIS after the Madoff fraud was revealed (App. to WNB's L.R. 56(a)(1) Stmt. Exs. N, V).  Viewed in the light most favorable to the Plaintiffs, this evidence creates a triable issue about whether the Plaintiffs both could and would have withdrawn some or

all of their investments with BLMIS if WNB had attempted to audit or verify BLMIS' assets, uncovered evidence of fraud or other suspicious activity, and disclosed it to the Plaintiffs.  Summary judgment limiting the Plaintiffs' ability to recover based on investments made prior to 1999 is not warranted.

> b.    Fictitious profits

WNB argues that the Plaintiffs cannot recover lost profits damages because such damages based on the fictitious profits reported by a Ponzi scheme are not legally cognizable.  The Plaintiffs argue that they invested with BLMIS with the expectation that their investments would appreciate; now that their investments have no value, they seek to recover lost profits in the form of lost investment income which they could reasonably anticipate had they invested in a bona fide investment instead of a Ponzi scheme.  This Court concludes that the Plaintiffs' theory of damages is legally permissible and that they may present it to the jury at trial.

In Connecticut, the default rule is that recovery of lost profits on a breach of contract claim is permissible: "[u]nless they are too speculative and remote, prospective profits are allowable as an element of damage whenever their loss arises directly from and as a natural consequence of the breach."  *West Haven Sound Development Corp. v. City of West Haven*, 207 Conn. 308, 317, 541 A.2d 858 (1988).  In addition, the Connecticut Supreme Court has endorsed a flexible approach to permit consideration of lost profits damages based on professional negligence and breach of fiduciary duty claims.  *Beverly Hills Concepts, Inc. v.*

*Schatz & Schatz, Ribicoff & Kotkin*, 247 Conn. 48, 67-68, 717 A.2d 724 (1998).[23]

In the context of SIPA liquidations and securities fraud claims, WNB is quite right that victims of Ponzi schemes or other fraud may not recover fictitious profits.  See, e.g., <u>Official Comm. of Unsecured Creditors of WorldCom, Inc. v. Sec. &  Exch. Comm'n</u>, 467 F.3d 73, 84 (2d Cir. 2006) (Securities Act and Securities Exchange Act); <u>In re New Times Sec. Servs., Inc.</u>, (<u>New Times II</u>), 467 F.3d 125, 130 (2d Cir. 2006) (SIPA); <u>In re New Times Sec. Servs., Inc.</u> (<u>New Times I</u>), 371 F.3d 68, 87 (2d Cir. 2004) (SIPA); <u>Levine v. Seilon, Inc.</u>, 439 F.2d 328, 334 (2d Cir. 1971) (Securities Exchange Act).  In adjudicating the liquidation of BLMIS under SIPA, the United States Bankruptcy Court for the Southern District of New York has reached the same conclusion.  <u>In re Bernard L. Madoff Investment Sec. LLC</u> (<u>In re BLMIS</u>), 424 B.R. 122, 133-35 (Bankr. S.D.N.Y. 2010), *aff'd* 654 F.3d 229 (2d Cir. 2011) (permitting defrauded investors to recover only their net investment losses)

But WNB has cited no authority imposing such a restriction on contract or tort claims.  Analysis from the BLMIS liquidation proceedings suggests that such

---

[23] Permitting the Plaintiffs to present their theory of damages to the jury also comports with permissible damages based analogous theories of recovery, such as upon a negligent failure to audit retirement plan assets, *Anoka Orthopaedic Assocs. v. Mutschler*, 773 F. Supp. 158, 170-71 (D. Minn. 1991) (applying Minnesota law); *cf. Crowley v. Chait*, Civ. No. 85-2441 (HAA), 2004 WL 5434953, at *12 (D.N.J. Aug. 25, 2004) (applying New Jersey law), and breach of fiduciary duty by a trustee of a qualifying Employee Retirement Income Security Act ("ERISA") plan, *Donovan v. Bierwirth*, 754 F.2d 1049, 1056 (2d Cir. 1985) ("[T]he measure of loss applicable under ERISA section 409 requires a comparison of what the Plan actually earned on the . . . investment with what the Plan would have earned had the funds been available for other Plan purposes.").

a restriction does not apply with a solvent defendant, like WNB, instead of a limited fund.  In re BLMIS, 445 B.R. 206, 229 (Bankr. S.D.N.Y. 2011) (distinguishing the award of lost investment income as lost profits damages in *Visconsi v. Lehman Bros., Inc.*, 244 F. App'x. 708, 713 (6th Cir. 2007), because, among other reasons, "[the defendant] was solvent and had assets of its own to satisfy the arbitration award, [so] enforcing the award against [the defendant] would not, unlike here, be to the detriment of other investors.").  In the absence of any authority, much less binding authority, counseling in favor of excluding lost investment income damages in these circumstances, this Court will adhere to the long-standing Connecticut rule permitting consideration of lost profits damages.

The Plaintiffs have presented evidence that they invested in BLMIS with the expectation that their investments would appreciate.  (*E.g.* App. to WNB's L.R. 56(a)(1) Stmt. Ex. H, at 32:2-33:25.)  This evidence creates an appropriate jury issue as to whether the Plaintiffs may recover lost investment income if they succeed on their claims for relief.  Accordingly, summary judgment limiting the Plaintiffs' ability to recover lost investment income as damages is not proper, and the Plaintiffs may permissibly seek to recover lost profits damages in the form of lost investment income at trial.[24]

3.    Economic loss rule

---

[24] The Plaintiffs argue that the best measure of their lost investment income is reflected in the value stated in each Plaintiffs' last statement showing the purported value of his BLMIS investment.  (Pl.'s Opp. to WNB's Mot. for Summ. J. at 12-13.)  This question is for the jury.

WNB argues, based on the economic loss rule, that the Plaintiffs may not recover on their tort claims because the relationship between the parties is exclusively contractual and the Plaintiffs only allege economic injury.  (WNB's Mem. in Support of Mot. for Summ. J. at 19-21.)  Because the Plaintiffs have produced sufficient evidence of liability and damages to maintain separate contract and tort causes of action through the summary judgment stage, this Court concludes that the economic loss rule does not bar the Plaintiffs' tort claims at this point.

In general, Connecticut law permits contract and tort claims to coexist. *See Williams Ford, Inc. v. Hartford Courant Co.*, 232 Conn. 559, 579, 657 A.2d 212 (1995) ("The [plaintiffs] were not barred from pursuing a negligence claim solely because they also might have had a breach of contract claim."); *Johnson v. Flammia*, 169 Conn. 491, 496, 363 A.2d 1048 (1975) ("A party may be liable in negligence for the breach of a duty which arises out of a contractual relationship.").  The Connecticut Supreme Court has held that the economic loss rule, an exception to this general principle, prevents a plaintiff bringing a claim based on a contract for the sale of goods from also seeking to recover on a negligent misrepresentation theory.  *Flagg Energy Development Corp. v. General Motors Corp.*, 244 Conn. 126, 153, 709 A.2d 1075 (1998). The Connecticut Supreme Court has declined to clarify whether and to what extent the economic loss rule applies in other circumstances. *See American Progressive Life & Health Ins. Co. of New York v. Better Benefits, LLC*, 292 Conn. 111, 118-19, 971 A.2d 17

(2009).

This Court has previously concluded that, at the motion to dismiss stage, the general rule permitting simultaneous contract and tort claims allows "a plaintiff [to] pursue contract and tort claims simultaneously as long as the plaintiff has alleged sufficient facts and damages to maintain separate contract and tort causes of action." *Factory Mut. Ins. Co. v. Pike Co., Inc.,* No. 3:08-cv-1775 (VLB), 2009 WL 1939799, at *3 (D. Conn. July 6, 2009). This Court concludes that the same principle should apply at the summary judgment stage. Accordingly, because the Plaintiffs here have presented evidence sufficient for both their contract and tort claims to survive summary judgment separately, this Court similarly declines to restrict them to their contract remedies at this stage.

### 4.     Statute of limitations

Finally, WNB argues that the six-year statute of limitations on contract claims found in Conn. Gen. Stat. Ann. 52-576(a) has run on all of the Plaintiffs' claims for fees paid to WNB prior to December 2, 2003. (WNB's Opp. to Pl.'s Mot. for Partial Summ. J. at 30-31.) Because the Plaintiffs' claims arise out of a contract for ongoing services and a continuing course of conduct breaching that contract, WNB's argument fails.

"No action for an account, or on any simple or implied contract, or on any contract in writing, shall be brought but within six years after the right of action accrues." Conn. Gen. Stat. Ann. 52-576(a). "Connecticut permits its six-year statute of limitation for contract claims to be tolled where the breach constitutes

a continuing course of conduct." *Air Brake Sys., Inc. v. TUV Rhineland of N. Am., Inc.*, 699 F. Supp. 2d 462, 474 (D. Conn. 2010) (citing *City of West Haven v. Commercial Union Ins. Co.*, 894 F.2d 540, 545 (2d Cir. 1990); *Beckenstein v. Potter & Carrier, Inc.*, 191 Conn. 150, 464 A.2d 18, 23 (1983)); *see also Skidmore, Owings, & Merrill v. Conn. Gen. Life Ins. Co.*, 25 Conn. Supp. 76, 93, 197 A.2d 83, 91 (Super. 1963) ("In considering the application of the [s]tatute of [l]imitations to this case, one must distinguish between a contract obligation, such as was undertaken by the plaintiff, providing for a continuing, indivisible responsibility for the attainment of an end result, and a contract for the performing of a specific, definable act.").

Here, the custodial agreement was clearly a contract for ongoing services; it provides for its continuous operation until one of the parties terminates it upon 90 days written notice to the other party.  (App. to WNB's L.R. 56(a)(1) Stmt. Ex. U, at 2.)  WNB charged its ongoing fees based on this ongoing relationship.[25] Accordingly, WNB's charging of fees, which the Plaintiffs claim were improperly calculated, for ongoing services prior to December 2, 2003 constituted part of a continuing course of conduct which continued at least until the BLMIS fraud was revealed.  The Plaintiffs' cause of action therefore did not accrue until well after December 2, 2003, and this Court concludes that the Plaintiffs' claims based on

---

[25] This fact distinguishes this case from *Kunian v. Development Corp. of Am.*, 165 Conn. 300, 311, 334 A.2d 427 (1973) and *Weadon v. First Nat. Bank & Trust Co.*, 129 Conn. 541, 543, 29 A.2d 779 (1943); neither one involved ongoing payments in exchange for ongoing services.

fees paid prior to December 2, 2003 are timely.

IV.     <u>Conclusion</u>

As stated and for the reasons articulated above, the Plaintiffs' motion for summary judgment [Dkt. # 67] is DENIED and WNB's motion [Dkt. # 69] is GRANTED IN PART and DENIED IN PART.

SO ORDERED.

Dated at Hartford, Connecticut, this 28 day of March, 2012.


_____/s/_____
Vanessa L. Bryant, U.S. District Judge
United States District Court