UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| AUDREY SHORT, Individually, | : | |
| FAYE ALBERT, Individually and as | : | |
| TRUSTEE for the FAYE S. ALBERT | : | CIVIL ACTION |
| RETIREMENT PLAN, | : | |
| PLAINTIFFS, | : | No. 3:09cv1955(VLB) |
| | : | |
| v. | : | MARCH 31, 2014 |
| | : | |
| WESTPORT NATIONAL BANK, | : | |
| DEFENDANT. | : | |

<u>MEMORANDUM OF DECISION DENYING PLAINTIFFS' MOTION FOR JUDGMENT,
OR IN THE ALTERNATIVE, MOTION FOR A NEW TRIAL [Dkt. 309]</u>

Before the Court is Plaintiffs Audrey Short, individually, Faye Albert, individually, and Faye Albert as Trustee for the Faye S. Albert Retirement Plan's (collectively, the "Plaintiffs") motion for judgment, or in the alternative, motion for a new trial on Plaintiffs' breach of contract claims.  [Dkt. 309.]  For the following reasons, the Plaintiffs' motion is DENIED.

I.    <u>BACKGROUND</u>

Plaintiffs brought this action to recover money they lost as the result of a Ponzi scheme perpetrated by Bernard L. Madoff as principal of Bernard L. Madoff Investment Securities, LLC ("BLMIS"). Each Plaintiff invested in BLMIS through individual custodial accounts maintained at Westport National Bank ("WNB").

At the trial, the jury heard the following facts.  All of the Plaintiffs were clients of PSCC, Inc. and PSCC Services, Inc. (collectively "PSCC"), both of which were pension and retirement plan consulting firms.  By and through their principal, Robert L. Silverman, the firms prepared pension and or retirement plans for the Plaintiffs, submitted the plans for approval to the IRS, arranged for

the investment of plan assets, provided periodic reports on plan investments and oversaw the administration of the plans. PSCC was responsible for advising the Plaintiffs on the amount of contributions, together with investment earnings on prior contributions, required for the plans to meet their financial obligations to plan beneficiaries. In 1986, Silverman entered into an arrangement with Madoff whereby PSCC clients would be permitted to invest with BLMIS by pooling their assets with an intermediary custodian.  The intermediary custodian would hold an omnibus account at BLMIS composed of the combined assets of PSCC's pension and retirement fund clients.

Initially, Westport Bank and Trust ("WBT") served as the intermediary custodian. In 1999, after WBT was acquired by Hudson United Bank ("HUB"), HUB asked BLMIS to provide details of its investment of funds in the omnibus account and BLMIS refused.  HUB resigned and PSCC arranged for WNB to be the successor custodian.  Silverman provided the Plaintiffs with forms directing BLMIS to transfer their funds held in the HUB omnibus account into a newly opened WNB omnibus account at BLMIS.  WNB opened an omnibus account at BLMIS into which BLMIS reported that it had transferred Plaintiffs' funds.  At the time of the purported transfer, WNB did not audit the omnibus account or take any steps to verify that the omnibus account contained the assets reported by BLMIS. The Custodian Agreement did not state that WNB must audit the assets transferred and the jury heard testimony that although it was customary for a successor custodian to reconcile the records of the prior custodian with those of

the investment manager, it was not customary for transferee custodians to verify the existence of the transferred assets.

The custodian agreement limited WNB's role in monitoring the investment of the pension and retirement funds deposited into the custodian accounts.  It specifically stated "[WNB] has no authority or ability to direct or oversee in any manner the discretionary investments made by BLMIS; . . . [WNB] is acting solely in a ministerial capacity; . . . [and WNB] assumes no responsibility for the investment performance of BLMIS; . . ." [Pl. Trial Ex. 103.] Its only duties relevant to the issue at hand were to "maintain adequate records indicating the ownership by [the Plaintiffs] of investments with BLMIS and held by [WNB] as custodian for [the Plaintiffs]" and to "render at least annually statements reflecting the property held by it as custodian hereunder." *Id.* The jury heard evidence that WNB received daily trading reports from BLMIS, which it rarely attempted to verify, and prepared monthly statements for each of the Plaintiffs reflecting their proportional share of the omnibus BLMIS account and the fees due, owing, and paid to PSCC and WNB for services rendered in conformity with the custodian agreements which were calculated based on the average annual assets held in their account. WNB and PSCC both calculated these fees based on the assets reported by BLMIS.  They also heard testimony that PSCC limited communication between the Plaintiffs and WNB and that PSCC was the primary and dominant source of information concerning their account.

Madoff was indicted for securities fraud and pleaded guilty.  During his plea colloquy he admitted that since the early 1990s he "represented to clients

and prospective clients who wished to open investment advisory and individual trading accounts with [him], that [he] would invest their money in shares of common stock, options, and other securities, of large, well-known corporations, and upon request, would return to them, their profits and principal" but that he "never invested these funds in the securities, as [he] had promised."  Tr. of June 27, 2013 Trial Proceedings at 137:1-6, 8-9, 23-24 *Levinson*, No. 3:09-cv-269 (D. Conn.), ECF. No. 636 (quoting Def. Trial Ex. 1019).  Madoff's plea colloquy indicates there were never any funds in the HUB omnibus account maintained at BLMIS and that no funds were transferred into the WNB account, nor were there ever any funds in any of his customers' accounts, as "the funds were deposited in a bank account at Chase Manhattan Bank" instead of being invested.  *Id.* Madoff and his co-defendant Frank DiPascali, Jr. admitted in their plea colloquies that BLMIS falsified securities transactions based upon actual market activity and that all customer investments were used to fund withdrawals of other customers whose funds had not been invested.  Tr. of June 27, 2013 Trial Proceedings at 134:9-19, 137:9-15, 139:25-140:23, *Levinson*, No. 3:09-cv-269 (D. Conn.), ECF. No. 636 (quoting Def. Trial Exs. 1021, 1019). DiPascali admitted that he used historical prices of actual stock trades made by other investors to post purchases and sales of stock to customer accounts, including WNB's omnibus account at BLMIS, as if they had actually been executed in order to reflect the rate of return directed by Bernie Madoff. *Id.*  He also admitted that he submitted to clients fictitious account statements reflecting the fictitious trades.  The jury also learned that BLMIS retained an independent auditor, the accounting and auditing firm of

4

Friehling & Horowitz, CPAs, P.C., which falsely purported to have audited BLMIS. Tr. of June 27, 2013 Trial Proceedings at 129:4-130:22, *Levinson*, No. 3:09-cv-269 (D. Conn.), ECF. No. 636 (quoting Def. Trial Ex. 1160).

The gravamen of the dispute presented to the jury for its determination was whether WNB breached any duty under the custodian agreement that caused the Plaintiffs to suffer a loss.  As discussed more fully below, the jury's verdict, rendered on interrogatories requested and approved by the parties, indicates that while it found that WNB did, as it admitted in part, violate the custodian agreement and failed to fully perform in accordance with its terms, WNB'S breaches did not directly and proximately cause Plaintiffs' losses.

II.   <u>LEGAL STANDARD</u>

The Supreme Court has instructed that "it is the duty of the courts to attempt to harmonize the [jury's] answers, if it is possible under a fair reading of them: 'Where there is a view of the case that makes the jury's answers to special interrogatories consistent, they must be resolved that way.'" *Gallick v. Baltimore & Ohio R.R. Co.*, 372 U.S. 108, 119 (1963) (quoting *Atlantic & Gulf Stevedores, Inc. v. Ellerman Lines, Ltd.*, 369 U.S. 355, 364 (1962)).  The court "must attempt to reconcile the jury's findings . . . before [it is] free to disregard the jury's special verdict. . . ." *Gallick*, 372 U.S. at 119 (internal citations omitted). "[A] search for one possible view of the case which will make the jury's findings inconsistent results in a collision with the Seventh Amendment." *Atlantic & Gulf Stevedores*, 369 U.S. at 364 (citations omitted).  "[I]f there is any way to view a case that makes the jury's answers to the special verdict form consistent with one another,

the court must resolve the answers that way even if the interpretation is strained."  *McGuire v. Russell Miller, Inc.*, 1 F.3d 1306, 1311 (2d Cir. 1993) (citing *Atlantic & Gulf Stevedores*, 369 U.S. at 364).  "The district court should refer to the entire case and not just the answers themselves."  *McGuire*, 1 F.3d at 1311 (citing *Royal Cup, Inc. v. Jenkins Coffee Srvc., Inc.*, 898 F.2d 1514, 1519 (11th Cir. 1990)).

III.   <u>DISCUSSION</u>

Plaintiffs' case was consolidated with two other cases for the purposes of trial, *Levinson v. Westport National Bank*, et al., No. 3:09-cv-00269 (D. Conn.), and *Davis, et al. v. Connecticut Community Bank*, No. 3:10-cv-00261 (D. Conn.).  On April 19, 2013, the Plaintiffs in the three cases, together with Defendants, filed a joint trial memorandum containing, among other things, proposed jury instructions and a proposed verdict form.  Trial Memo, *Levinson*, 3:09-cv-00269 (D. Conn. Apr. 19, 2013), ECF no. 529.[1]  The Court held hearings on the record on July 10 and July 11, 2013, following the close of evidence but before the case went to the jury, at which the parties had the opportunity to comment on and object to the proposed final versions of the jury instructions and verdict form. Plaintiffs do not claim that they objected to the interrogatories which they now challenge, or that the question was submitted to the jury over their objection.

---

[1] The joint trial memorandum was filed on the docket of the *Levinson* case, and was not filed on the docket in the instant litigation.  However, the Plaintiffs in this case joined in the filing of the Joint Trial Memorandum in *Levinson*, and filed a notice on the docket in this action stating that they "adopt[ed] and incorporate[d] the Joint Trial Memorandum filed in *Levinson* in its entirety, including all exhibits thereto."  [Dkt. 164 at 1.]

After the close of evidence and before closing argument, the parties reported the case was tentatively settled and asked for a continuance to secure their client's consent.  The parties in the *Levinson* and *Davis* actions reached a settlement with the Defendants and did not return on the next trial date.  The Short and Albert Plaintiffs did not settle and the case proceeded on the breach of contract and breach of fiduciary duty claims, as the Court had previously granted summary judgment in favor of the Defendants on Plaintiffs' aiding and abetting claim, [Dkt. 123 at 31], and Plaintiffs withdrew their negligence claim prior to closing argument in the trial, [see Dkt. 310 at 6].  On July 17, 2013 the Jury returned its verdict.

The jury was given the following instruction:

> **BREACH OF CONTRACT – CAUSATION**
>
> **If you find that the Plaintiffs have proved by a fair preponderance of the evidence that the Defendant breached its contract with the Plaintiffs in either of the ways the Plaintiffs allege, you must then decide whether that breach was the legal cause of any of the Plaintiffs' claimed injuries. In order to recover for breach of contract, the Plaintiffs must prove that that Defendant's breach was both a direct cause and a proximate cause of the damages allegedly suffered by the Plaintiffs. To be entitled to damages in contract Plaintiffs must establish a causal relation between the breach and the damages flowing from that breach. Such causal relation must be more than surmise or conjecture, inasmuch as you are concerned not with possibilities but with probabilities. Where the damages claimed are remote from the breach complained of and the causal connection is wholly conjectural, there can be no recovery.**

**[Jury Instructions at 30.][2]**

---

**[2] The jury instructions do not appear on the docket in this case.  The Court relied upon a copy of the jury instructions kept in the case file in the Office of the Clerk.**

The verdict form completed by the jury contained the following questions and responses regarding Plaintiffs' breach of contract claim:

1. Has [Plaintiff] proven, by a preponderance of the evidence, that WNB breached the Custodian Agreements entered into with them by calculating the fees owed to WNB and PSCC under the Custodian Agreements based on the value of the assets as reported by BLMIS, rather than on the actual assets at BLMIS?
   __X__ YES _____ NO

2. Has [Plaintiff] proven, by a preponderance of the evidence, that WNB breached the Custodian Agreements entered into with them by failing to maintain adequate records of the assets it was holding for each custodian account; by failing to render accurate annual statements to plaintiffs reflecting the property it was holding as custodian of their accounts; or by failing to audit or otherwise verify the existence and value of such assets and report the true value of said custodian accounts?
   __X__ YES _____ NO

   If you have answered Yes to either Question B-1 or B-2, continue to Question B-3. If you have answered No to both of these questions, continue to Question C-1.

3. Has [Plaintiff] proven, by a preponderance of the evidence, that they suffered economic loss as a direct and proximate result of any breach(es) by WNB of its Custodian Agreements with them?
   _____ YES __X__ NO

[Dkt. 302, Verdict Form at 2.][3]

After the jury delivered its verdict, the Court entered judgment on behalf of Defendant. Plaintiffs then made an oral motion for judgment notwithstanding the verdict. [Dkt. 299.] Plaintiffs filed this written motion for judgment or in the alternative a new trial on July 25, 2013, seeking either (1) that the Court enter

---

[3] Separate verdict forms were completed for each of the three plaintiffs. The forms were substantively the same for each plaintiff, and the same answers were entered on each plaintiff's form.

judgment against Defendants on the breach of contract claim and hold a trial to determine the amount of damages, or alternatively, (2) that the Court conduct a new trial on liability for the breach of contract claim.

Plaintiffs argue: (1) that the wording of question B-3 of the verdict form renders the jury's response to that question ambiguous and that the Court should accept the Plaintiffs' view of both the text of question B-3 and the jury's response to that question; and (2) that questions B-1 and B-2 are sufficient to establish liability for the Defendants and that question B-3 should be viewed in a way that makes it unnecessary and irrelevant.

## A. WAIVER OF OBJECTION TO VERDICT FORM

### 1. Plaintiffs Proposed the Verdict Form Text

Defendants assert, and the Court agrees, that Plaintiffs have waived their objections to the verdict form. Because Plaintiffs' arguments arise out of the text of the questions on the verdict form, the Plaintiffs have waived any objection to those questions, as the relevant portions of the verdict form used by the jury are substantively the same as the relevant portions of the proposed verdict form jointly submitted, and indeed proposed by the parties as part of their Joint Trial Memorandum. The proposed verdict form, submitted as part of the parties' joint trial memorandum contained the following questions on the breach of contract claims:

> 1. Have the Short plaintiffs proved, by a preponderance of the evidence, that CCB breached its agreements with them by failing to safeguard the assets purportedly held at BLMIS, by auditing or otherwise verifying the existence and value of such assets or by

establishing other proper controls against risk of loss at BLMIS?

_____ YES _____ NO

2.  Have the Short plaintiffs proved, by a preponderance of the evidence, that CCB breached its agreements with them by failing to maintain accurate records of the assets it was holding for each custodian account; by failing to render accurate annual statements to plaintiffs reflecting the property it was holding as custodian of their accounts; or by failing to accurately ascertain and report the true value of said custodian accounts?

_____ YES _____ NO

3.  Have the Short plaintiffs proved, by a preponderance of the evidence, that CCB breached its agreements with them by overcharging fees? [4]

_____ YES _____ NO

If you have answered Yes to any one of Questions A1 through A3, continue to Question A-4. If you have answered No to all of these questions, continue to Question B-1.

4.  Have the Short plaintiffs, proved by a preponderance of the evidence, that they suffered economic loss as a direct and proximate result of any breach(es) by CCB of its agreements with them?

_____ YES _____ NO

Trial Memo, Ex. H, Proposed Joint Verdict Forms, *Levinson*, 3:09-cv-00269 (D. Conn. Apr. 19, 2013), ECF No. 529.  Question B-3 of the final verdict form is substantively identical to Question 4 above, jointly proposed by the parties on the proposed verdict form.  Although changes were made to some of the other questions on the verdict form regarding breach of contract, those changes do not

---

[4] This question was removed after the charge conferences held on July 10 and July 11, 2013. Tr. of July 10, 2013 Trial Proceedings at 45:18-46:13, *Levinson*, No. 3:09-cv-269 (D. Conn.), ECF. No. 646; Tr. of July 11, 2013 Trial Proceedings at 28:25-30:11, *Levinson*, No. 3:09-cv-269 (D. Conn.), ECF. No. 647.

affect the interpretation of question B-3 on the final verdict form.  The structure of the proposed verdict form is also nearly identical to the structure of the final verdict form.  On both forms, the initial questions ask the jury to find whether the Plaintiffs have proven specific instances of breach, and then if the jury has answered "yes" to one or more of the initial questions, the jury is directed to consider the final question, which, as discussed below, infra Part III.B.1, asks if Plaintiffs have proven the element of causation.  Although there are some differences between the initial questions regarding breach of contract on the proposed verdict form and those on the final verdict form, the substance of question B-3 is not affected by those changes, and it retains the same relevance.  Thus, the differences between the proposed verdict form and the final verdict form do not negate Plaintiffs' waiver of their objection.[5]  As a result, Plaintiffs have waived any objections, if not tacitly consented, to the language of the verdict form on the breach of contract questions submitted to the jury as it is substantively the same as the question they requested.

2.    **Plaintiffs Waived any Objection to the Actual Verdict Form Text**

Even if Plaintiffs' suggestion of the language does not constitute a waiver, their silence does.  Plaintiffs did not raise any objections to the verdict form when given the opportunity at the charge conference held shortly before the case went to the jury.  At the charge conference, when the parties were given the opportunity to comment on the jury instructions and the verdict form, the

---

[5] Responding to a motion by the Defendants to amend the verdict forms, Plaintiffs themselves asserted that "[t]he parties literally spent hours negotiating and resolving the wording of the Verdict Forms Regarding Liability submitted in their Joint Trial Memorandum."  [Dkt. 286 at 2.]

Plaintiffs, when asked if they had further issues with respect to the breach of contract questions did not raise any objections to the jury charge or verdict form's questions on the breach of contract claim.  Tr. of July 11, 2013 Trial Proceedings at 30:9-15, *Levinson*, No. 3:09-cv-269 (D. Conn.), ECF. No. 647.  Nor did they raise objections to the form of the breach of contract questions on the verdict form at any other time before the case went to the jury.   Federal Rule of Civil Procedure 51(c)(1) provides "[a] party who objects to an instruction or the failure to give an instruction must do so on the record, stating distinctly the matter objected to and the grounds for the objection" and subsection (d) requires that the objection be raised before the jury retires. Fed. R. Civ. P. 51(c)-(d).   As the Second Circuit has explained, "[w]aiver of an objection to an inconsistent verdict has been found in this Circuit when the inconsistency was caused by an improper jury instruction or verdict sheet and there was no objection to either the instruction or verdict sheet prior to submission of the case."  *Kosmynka v. Polaris Indus., Inc.*, 462 F.3d 74, 84-85 (2d Cir. 2006) (citations omitted).  The Plaintiffs complain of "[errors] that could have been corrected prior to submission of the case to the jury."  *Kosmynka*, 462 F.3d at 85.  The "[f]ailure to object to a jury instruction or the form of an interrogatory prior to the jury retiring results in a waiver of that objection." *Jarvis v. Ford Motor Co.,* 283 F.3d 33, 57 (2d Cir. 2002) (internal quotations omitted). "Surely litigants do not get another opportunity to assign as error an allegedly incorrect charge simply because the jury's verdict comports with the trial court's instructions." *Lavoie v. Pacific Press & Shear Co.*, 975 F.2d 48, 55 (2d Cir. 1992) (citation omitted); *see also Barrett v.*

*Orange Cnty. Human Rights Comm'n,* 194 F.3d 341, 349 (2d Cir. 1999); *Hagelthorn v. Kennecott Corp.,* 710 F.2d 76, 85 (2d Cir. 1983). Likewise, a party cannot prevail on a post-verdict objection to an interrogatory where, as here, the party proposed the interrogatory, the Court acquiesced to the party's request for the interrogatory, the Court conducted a charge conference before submitting the interrogatory to the jury and the party failed to object to the language or the context of the interrogatory until after a verdict was rendered against it.

B.    **LEGAL SUFFICIENCY OF THE VERDICT FORM**

Plaintiffs raise legal objections to the verdict form in their reply brief not raised in their motion or supporting memorandum.  In their reply brief, Plaintiffs contend that a judgment based on a question that is superfluous or a question that is an incorrect statement of the law must be reversed, regardless of whether a timely objection was raised.  [Dkt. 314 at 2-3.]  Plaintiffs also argue that inconsistent responses to the questions on the verdict form present grounds for the grant of a new trial regardless of whether a timely objection was raised.  [Dkt. 314 at 4.]  Both of these arguments are rooted in the text of the verdict form, and are insufficient to cure Plaintiffs' waiver.  Further, even if Plaintiffs could raise these arguments, the Court does not find Plaintiffs' view of the verdict form to be persuasive, and does not find that the verdict form contains an incorrect statement of the law.  See infra Part III.B.2.

1.    **Plaintiffs' Argument that Question B-3 is Ambiguous**

Although they do not make the argument specifically, Plaintiffs implicitly argue that question B-3 is ambiguous because question B-3 can be read to

contain two different questions.  [Dkt. 310 at 3.]  As a result, an answer of "no" to question B-3 could mean that the jury found that Plaintiffs had not proven "that they suffered economic loss", or it could mean that Plaintiffs had not proven that they suffered damages "as a direct and proximate result of any breach(es) by WNB", or both.  Plaintiffs assert that this ambiguity creates the possibility that the jury's response was based on a misapplication of the law or unsupported by the facts, and that if the jury answered "no" to question B-3 solely because they believed that the Plaintiffs had not proven that "they suffered economic loss", that conclusion would be incorrect as a matter of law, and unsupported by the facts.  Plaintiffs appear to argue that if the jury intended their answer "no" to mean that Plaintiffs had not proven damages but had proven causation, then judgment should be entered in Plaintiffs' favor, as plaintiffs were not required to prove actual damages.  The Court finds first that as described above in Part III.A Plaintiffs have waived any objection to the text of question B-3.  The parties could have anticipated before the case went to the jury a potential scenario where the jury answered "no" to question B-3, and the issue could have been addressed at that point.  *Cf. Kosmynka*, 462 F.3d at 85.

Even if Plaintiffs had not waived this argument, the Court finds it unpersuasive. Here, it is not necessary for the court to search for a way or strain to reconcile the jury's answers to the questions on the special verdict form.  First, the interrogatory is clear and inconsistent with the Plaintiffs' suggested alternative reading that the jury found that Plaintiffs had proven causation.  The jury charge clearly instructed the jury to determine causation, not damages.

Courts presume that juries follow clear instructions. *Cf. United States v. Caronia*, 703 F.3d 149, 174 (2d Cir. 2012) ("We presume that juries follow their instructions.") (citation omitted).

Reference to the entire case record makes patently clear the jury's understanding of the questions it was asked to consider and the logical consistency and factual support for its answers.   The Court finds that the jury's response to question B-3 is consistent with the rest of the verdict form when viewed as a finding that Plaintiffs failed to prove the required element of causation, a view of the response that is supported by the record.   The jury instructions make clear that this question is directing the jury to make a finding on whether Plaintiffs have proven causation.   The jury instructions include a section titled "Breach of Contract – Causation", which instructs the jury that "[i]f you find that the Plaintiffs have proved by a fair preponderance of the evidence that Defendant breached its contract with the Plaintiffs in either of the ways the Plaintiffs allege, you must then decide whether that breach was the legal cause of any of the Plaintiffs' claimed injuries."   [Jury Instructions at 30.]  This instruction tracks the verdict form, which first asks in questions B-1 and B-2 whether the Plaintiffs have proven a breach by the Defendant, and then asks in question B-3 whether Plaintiffs have proven causation.   Viewing question B-3 in this way, the jury's response is not at all inconsistent with the responses to question B-1 and question B-2.   Having found that Plaintiffs had proven the breaches presented in both question B-1 and question B-2, the jury then considered whether Plaintiffs had proven that their damages were "a direct and proximate result of any

breach(es)."  The Plaintiffs appear to be conflating causation and breach.   Here, the jury was presented with concurrent breaches.  The first was Madoff's breach in misappropriating the Plaintiffs' money upon deposit and the bank's breach is failing to verify the assets and maintain proper records.  Madoff's breach resulted in the loss of Plaintiffs' investment and their phantom earnings and WNB's breach resulted in the bank receiving fees for work it performed as custodian of phantom assets that did not exist.

The jury could have readily determined that the bank's breaches were not the direct and proximate cause of the Plaintiffs' losses because of the sophistication of the fraud which entailed the submission to the bank of statements replicating actual securities trades and audits performed by an independent certified public auditing and accounting firm and which was so difficult to detect that even the Securities and Exchange Commission (the "S.E.C.") failed to detect it despite several examinations.  In addition, the jury could have found that the bank's collection of fees did not cause the Plaintiffs' losses because the fees were not paid from the Plaintiffs' account at BLMIS, as the evidence was that their account had no funds even before WNB became the custodian.  The bank's fees were paid with investments into BLMIS made by third parties.  Had the bank not received the fees, the funds used to pay the fees would have been misappropriated as Madoff stated under oath in his plea colloquy that he misappropriated funds immediately upon their investment with him by investors. Thus the jury could have concluded from the facts adduced at trial that the Plaintiffs had not proven causation.

Further, this view of question B-3 and the jury's response to that question is also supported by the Plaintiffs' proposed jury instructions filed with the joint trial memorandum, which include an instruction telling the jury that the Plaintiffs are required to prove causation:

> If you find that CCB breached any of the provisions of its agreements with plaintiffs, you must then determine whether plaintiffs have proved that they have sustained injuries as a result of any particular breach. "[I]n order to recover for breach of contract, a plaintiff must prove that he or she sustained damages as a direct and proximate result of the defendant's breach,"– that is, the breach of contract must be a substantial factor in causing the plaintiffs' claimed injuries and the injuries cannot be remote from the claimed breach.

Trial Memo, Ex. G-1, Plaintiffs' Proposed Jury Instructions, *Levinson*, 3:09-cv-00269 (D. Conn. Apr. 19, 2013), ECF No. 529 (quoting *Warning Lights & Scaffold Serv. V. O&G Indus., Inc.*, 925 A.2d 359, 362 (Conn. App. Ct. 2007).

The first question on the verdict form asked the jury:

> Do you find that [Plaintiffs] [have] proven by a fair preponderance of the evidence that BLMIS had the ability to honor a request from the Plaintiffs to withdraw all of their funds had they made such a request?
>
> _X__ YES ____ NO

[Dkt. 302, Verdict Form at 1.] Although the jury found that Plaintiffs had proven that BLMIS could have redeemed their money, this does not require the Court to adopt Plaintiffs' view of the verdict form.  Based on the evidence in the record, the jury could have found that the Defendants' failure to investigate the statements sent to them by BLMIS constituted breach, but that Plaintiffs had not proven causation as they failed to offer evidence showing that WNB would have discovered the fraud if they had investigated the statements, particularly in light of evidence of the sophistication of Madoff's fraud, including the plea colloquies

of Madoff, DiPascali, and the outside auditor, and the S.E.C.'s examinations and
report.

As with the verdict form, the Plaintiffs cannot write an insurance policy
insuring themselves against a loss by planting the seeds by which they can reap
the harvest of a new trial or a judgment notwithstanding a jury's verdict by
proposing and agreeing to an interrogatory which they can later challenge.

  2. **Plaintiffs' Argument that Question B-3 Is Incorrect As a Matter of Law**

Plaintiffs ask the Court to view the question B-3 as asking the jury whether
Plaintiffs have proven actual damages, and to view the jury's "no" response to
that question as a finding that Plaintiffs failed to prove actual damages. [Dkt. 310
at 3-7.] The Court declines to strain the reading of the interrogatory for the
reasons stated above. The jury could not have found that the Plaintiffs did not
suffer damages; rather they found that the damages they suffered were not
directly and proximately caused by the bank's breach.

Plaintiffs argue that viewed this way, question B-3 is a misstatement of
Connecticut law because by asking the jury whether Plaintiffs had "proven, by a
preponderance of the evidence, that they suffered economic loss . . ." the verdict
form requires them to have proven actual damages, which Plaintiffs argue is
incorrect under Connecticut law on breach of contract claims. [Dkt. 310 at 3-4.]
Plaintiffs assert, correctly, that under Connecticut law they need not show actual
damages to make a prima facie case of breach of contract, and may satisfy the
damages element of a breach of contract claim by seeking nominal damages
rather than actual damages. *See, e.g., Cambridge Manor of Fairfield, LLC v.*

*Myers*, No. FBTCV115029512S, 2012 Conn. Super. LEXIS 2824, at *9 (Conn. Super. Ct. Nov. 16, 2012) ("Actual damages, however, are not an element of a cause of action for breach of contract, nominal damages may be sought.") (citing *Hinchliffe v. Am. Motors Corp.*, 440 A.2d 810, 817-18 (Conn. 1981)). Further, Plaintiffs also argue correctly that the existence of nominal damages is assumed, and Plaintiffs need not introduce evidence to prove them. *Cf. Conn. Student Loan Foundation v. Enterprise Recovery Sys., Inc.*, No. 3:04-cv-00712, 2011 U.S. Dist. LEXIS 38821, at *10 (D. Conn. Apr. 11, 2011) ("Even if undisputed, then, the fact that '[plaintiff] has not been damaged' would provide no basis for judgment as a matter of law with respect to [plaintiff]'s breach of contract claim.").

        As noted above in Part III.A, Plaintiffs waived this argument by failing to raise this objection before the case went to the jury.  Even if they had not waived the argument, the Court would find it unpersuasive.  Plaintiffs are correct that they need not prove actual damages to establish a claim for breach of contract. However, the Plaintiffs are required to prove that their damages, nominal or otherwise, were "directly and proximately caused by a defendant's breach of contract," in this case WNB's breach.  *Cambridge Manor*, 2012 Conn. Super. LEXIS 2824, at *9-10 (quoting *McCann Real Equities Series XXII, LLC v. David McDermott Chevrolet, Inc.*, 890 A.2d 140, 153 (Conn. App. Ct. 2006)).  As question B-3 asks the jury whether the Plaintiffs proved, by a preponderance of the evidence, that they suffered economic loss as a direct and proximate result of any breaches by WNB of its Custodian Agreements, causation being a required element of breach of contract, it is not a misapplication of Connecticut law.

3.      Plaintiffs' Argument that the Response to Question B-3 Is
        Unsupported by the Facts

Plaintiffs further assert that viewing the jury's response to question B-3 as

a finding that Plaintiffs had not proven economic loss, the jury's answer of "no"

to question B-3 is unsupported by the facts in the record, and must have been

caused by the fact that the trial was bifurcated, with the questions of liability and

damages split into two different phases. [Dkt. 310 at 3, 6-7.] Plaintiffs assert that

they were unable to present evidence of their economic losses at this phase of

the trial, leading the jury to find that they had not proven economic loss. [Dkt.

310 at 3, 6-7.] Plaintiffs argue alternatively that the jury's conclusion is contrary

to the evidence in the record, as the record contains evidence of economic

losses, particularly a stipulation entered into by the parties setting forth the

amounts of fees paid by Plaintiffs, and other evidence presented at trial. [Dkt. 310

at 10.]

        This argument is irrelevant because, as noted above, supra Part III.B.1, the

Court does not accept Plaintiffs' view of the jury's response to question B-3, and

finds that the jury's response to question B-3 indicates that the jury found that

Plaintiffs had not proven the required element of causation, a finding that is not

inconsistent with the evidence presented at trial. Further, to the extent that

Plaintiffs assert error in the bifurcation of the trial, and the exclusion of evidence

as to the amount of damages, again, those are arguments that could have been

raised before the case went to the jury. The Court is unaware of and the Plaintiffs

assert no objection from Plaintiffs on the record regarding the Court's decision to

bifurcate the trial. Because they did not raise it before, the Court considers the

argument waived.  *Cf. Johnson v. Helmerich & Payne, Inc.*, 892 F.2d 422, 424 (5th Cir. 1990) (declining to review the district court's decision to bifurcate the liability and damages phases of a trial regarding strict liability and negligence claims where plaintiffs failed to object before the lower court on the record and the appellate court refused to accept plaintiffs' counsel's assertion that he made an off the record objection).  The Plaintiffs knew what evidence had and had not been introduced at trial, and were aware of the language of the proposed and final verdict form, and could have raised the objection at that time.  Because they did not, they have waived the objection.

Finally, it is incomprehensible that the jury found that the Plaintiffs failed to prove that they suffered any damages.  It was uncontested and the Defendants admitted repeatedly that the Plaintiffs' funds were misappropriated by Bernie Madoff.  That interpretation of the jury's response to question B-3 is wholly unsupported by and irreconcilable with the evidence and could not be reached even by a strained interpretation.

**C.**     **Plaintiffs' Argument that Questions B-1 and B-2 Were Sufficient To Establish Liability for Defendant**

Plaintiffs argue that the jury's answers to questions B-1 and B-2 alone are sufficient to establish liability for the Defendants.   [Dkt. 310 at 8-9.]  Plaintiffs assert that the jury's responses to question B-1 and question B-2 indicate that they found that Plaintiffs had proven all of the elements of breach of contract, including causation.  [Dkt. 310 at 7, 9-10.]  Plaintiffs' position is that because questions B-1 and B-2 themselves establish liability, and question B-3 is improper and/or unnecessary, the Court must disregard question B-3, enter

judgment in favor of Plaintiffs on their breach of contract claim, and hold a trial to determine the amount of damages that should be awarded on the breach of contract claim.

As noted above, the court "must attempt to reconcile the jury's findings . . . before [it is] free to disregard the jury's special verdict. . . ." *Gallick*, 372 U.S. at 119 (internal citations omitted).  Although both question B-1 and question B-2 ask the jury to find whether Plaintiff has proven "that WNB breached the Custodian Agreements . . .", the use of the word "breach" in that question does not mean that the jury found that the element of causation had been proven.  The instruction on causation states explicitly: "If you find that CCB breached any of the provisions of its agreements with plaintiffs, you must then determine whether plaintiffs have proved that they have sustained injuries as a result of any particular breach."  The jury was instructed that they must consider causation, even if they found that the Plaintiffs proved breach, and there is no indication that the jury failed to follow the instructions.

IV.    **CONCLUSION**

For the above reasons, the Plaintiffs motion for judgment or in the alternative for a new trial on Plaintiffs' breach of contract claims is DENIED

IT IS SO ORDERED.

Dated at Hartford, Connecticut this 31st day of March, 2014.

_____/s/_____
Vanessa L. Bryant
United States District Judge